SCHNEIDER v. BANK OF LANSING.

1. BUILDINGS—CONSTRUCTION ON LEASED PREMISES—OWNERSHIP.
Buildings erected on leased land become a part of the land and belong to the lessor even while in the course of construction.

2. LANDLORD AND TENANT—LONG-TERM LEASE—PERIODIC REDETERMINATION OF RENT—NEW BUILDINGS.
Plaintiff lessors of land upon which part of a 14-story building was erected some 14 years after commencement of the 99-year term *held*, entitled to rent on the basis of their proportionate interest in the new building, where lease provided for redetermination of rent every 10 years, and contemplated the maintenance or replacement of building standing on the property when leased.

3. SAME—REDETERMINATION OF RENT—RATE OF RETURN ON INVESTMENT.
Trial court's determination that a yield of 5% upon the value of plaintiffs' leased premises was a fair rate of return *held*, a proper primary basis for determining rent to be paid by lessee for 10-year period under 99-year lease containing provision for decennial redetermination of rent, where plaintiffs' investment was enhanced in value by the general prosperous conditions and not through any special efforts on the part of plaintiffs.

4. SAME—BANK BUILDING—DECENNIAL DETERMINATION OF RENT UNDER LONG-TERM LEASE.
Earnings, volume of business and comparative rentals with other buildings were proper factors for consideration in making decennial determination of rent under 99-year lease of 14-story bank building in city.

---

REFERENCES FOR POINTS IN HEADNOTES
[1] 22 Am Jur, Fixtures § 40.
[2–5] 32 Am Jur, Landlord and Tenant §§ 434–436.
[2–5] Factors and elements considered in fixing rental for extended or renewal term where renewal or extension lease leaves amount of rental for future determination. 6 ALR2d 448.
[6] 14 Am Jur, Costs § 92.

5. SAME—DECENNIAL REDETERMINATION OF RENT UNDER LONG-TERM
     LEASE—EVIDENCE.
       Judicial redetermination of rent for decennial period, as pro-
       vided in 99-year lease, was properly limited to a consideration
       of evidence pertaining to rent at beginning of such period and
       not beyond that date.

6. COSTS—APPEAL BY BOTH PARTIES.
       No costs are allowed either party, where both parties have
       appealed and decree is affirmed.

Appeal from Ingham; Salmon (Marvin J.), J.
Submitted June 11, 1953. (Docket No. 15, Calendar
No. 45,790.) Decided October 6, 1953.

Bill by Elizabeth Schreiber Schneider and others
against Bank of Lansing to determine the fair rental
value of real estate. Decree fixing rental for 10-
year period. Both parties appeal. Affirmed.

*Foster, Cummins, Snyder* & *Foster,* for plaintiffs
Schneider and estate of Henry R. Schreiber.

*Frederick C. Newman, Jr.,* for plaintiffs Schreiber
and Weidman.

*Ballard, Jennings, Fraser* & *Parsons* (*Joe C.
Foster,* of counsel), for defendant.

SHARPE, J. This is a chancery action to determine
the fair rental value of a portion of the building
housing the Bank of Lansing. The principal facts
are as follows: On June 17, 1919, the administratrix,
widow and heirs-at-law of John Herrmann, leased
the property to the City National Bank for a term
of 99 years from and after April 1, 1918.

The lease contained the following clause:

"The certain 4-story brick store building at
103 Washington Avenue, North, in said city of

Lansing, together with the lands upon which it stands, described as follows:

"Commencing at a point on the east line of lot number 10, in block 101 in said city, 22 feet and 4 inches north of the southeast corner of said lot, thence north 22 feet and 8 inches, thence west 66 feet and 8 inches, thence south 22 feet and 8 inches, thence east 66 feet and 8 inches to the place of beginning, together with the appurtenances thereunto belonging subject, however, to the rights of others in the north party wall and in the use of the stairway and stairway landing in said building as now located, for the term of 99 years from and after the first day of April, 1918, on the terms and conditions hereinafter mentioned, to be occupied for banking, mercantile and office purposes."

The lease also provided for insurance in an amount of not less than $5,000 against loss and damage by fire; that the lessee keep the building or buildings and all improvements in good repair, and that the lessee pay taxes assessed against the property. The following provision in the lease provides for the payment of rent:

"2. The said party of the second part does hereby hire said premises for the term of 99 years as above mentioned and does covenant and promise to pay to the said parties of the first part, their representatives and assigns, for rent of said premises for said term, the following yearly rentals, *viz*:

"Two thousand dollars per annum payable quarterly in advance until April 1, 1927; after that and for a period of 10 years, the amount of rental to be determined as may be agreed upon by the parties hereto. In the event of disagreement each party hereto shall select a referee, and said referees, so selected shall immediately thereafter select another referee. These 3 referees so selected shall agree upon and determine the annual rental for said premises, the finding or decision of any 2 thereof in writ-

ing to be binding upon the parties. This course of procedure in determining the annual rental shall be carried out on April 1, 1927, and on April 1st every 10 years thereafter during the life of this lease."

The land consists of 22 feet and 8 inches of frontage on the west side of the 100 block of North Washington avenue with a depth of 66 feet and 8 inches. At the time of the original lease, and until 1931, there was on the property a 4-story brick building, a part of which was owned by the lessors of the present lease.

Because of financial difficulties in 1931, the City National Bank sold all of its assets to the Capital National Bank which in turn assumed all the liabilities of the City National Bank. In 1933 the Capital National Bank did not reopen after the bank holiday. It was placed in conservatorship, which was followed by a receivership. In 1931 the buildings on the premises were razed and a 14-story building was constructed. The cost of the new building exceeded $634,000.

The building was completed in 1932. The Capital National Bank encountered financial difficulties. A receiver was appointed and the property sold to Albert Ehinger, or his nominee, which was a corporation known as the Lansing Real Estate Holding Company. This corporation negotiated a lease with the Bank of Lansing which contained an option to purchase the entire building. In July, 1949, the Bank of Lansing purchased the premises.

The Real Estate Holding Company had attempted to negotiate rental with plaintiffs for the period commencing April 1, 1947, for the ensuing 10 years as required by the lease. As long as the Real Estate Holding Company owned the premises it paid the rental on the basis of the rent determined by arbitrators for the period of 1937 to 1947. After the

Bank of Lansing became the owner of the premises it continued to pay rental on the basis of the 1937-to-1947-established rental.

Arbitration was attempted and failed. Thereafter, and on July 19, 1951, plaintiffs brought the present action to have the court establish a fair rental for the period from April 1, 1947, to March 31, 1957.

It is the position of the Bank of Lansing that plaintiffs' investment was a parcel of land with a 4-story brick building on it; that for a period of 12 years the building, attached to one of equal height to the south and a 3-story building to the north, usefully served the purposes of the City National Bank; that in 1931 the need for a new building became apparent; that the spirit of the lease was that at all times there should be included in plaintiffs' investment a 4-story brick building; and that plaintiffs are only entitled to a fair rental on the value of a 4-story brick building less its depreciation.

The trial court came to the conclusion that plaintiffs are entitled to rental on the proportion of the building as it now stands rather than on a 4-story building. In an opinion, he stated:

"It seems to this court, having in mind the kind of building that was on the property at the time the lease was entered into and that it was to be the home of a banking institution which presumably hoped to grow, and that the property was leased for such a long term that those circumstances standing alone are persuasive that it must have been the expectation and intent that at some future time the 4-story building would be torn down and another one constructed in its place and that the one to be constructed in its place might be larger and of a greater rental value. When each of those circumstances are considered in connection with the phrases in the lease relative to the building 'to be erected upon the lands' or 'others

erected in its place', and that the lease contains a clause permitting adjustment of rent at 10-year intervals and that the lease does not provide that at the end of the term the lessee will 'yield and deliver up' the original 4-story building, the conclusion seems inescapable that the parties intended that a new building even of greater size and value might be constructed. Then, if that was the intent, did the parties intend that the plaintiffs would be paid on the basis of improvements to the land? They did not expressly provide that they would not be, which it seems they would have done under the circumstances if that had been the intent. They made no express provision that rent, in the event of a new building, would be determined on a theoretical or imaginary 4-story building. Let us suppose this suit was being heard in the year 2000 instead of today. Is it likely that defendants' theory, if used then, would admit, because of the long lapse of time, of proof of the value of a theoretical 4-story building of 1931 vintage? The plaintiffs predecessors did not lease a 4-story theoretical building to the defendant, nor did they agree to receive rent on such a building, rather it appears to this court that they leased and intended to receive rent on the building then standing there or on a building to be erected in lieu there. Any other conclusion would be putting something into the lease that is not there. Thus this court finds that plaintiff should receive rent on the basis of the property as it stands and is used."

It is a general rule that buildings, even while in the course of construction on leased land, become part of the land and belong to the lessor. See *Rogers* v. *Goldman,* 249 Mich 31.

We note that paragraphs 4 and 5 of the lease provide:

"4. It is also agreed between the parties, that the party of the second part shall, during the entire term as aforesaid, keep the building erected and to be erected upon the lands above described insured in

the name of the said first parties against loss and damage by fire, by insurers, in amount (not less than $5,000) and in manner and in such companies as shall be approved by the said parties of the first part.

"5. The second party also agrees that it will at all times keep the building or buildings and all improvements and appurtenances which are now or may at any time be located on said premises, in a state of good and tenantable repair at its own expense, and that the said second party will make no structural alterations in any buildings now upon or which may be hereafter constructed upon said premises that will impair the value thereof, during the term of this lease. If the party of the first part shall consider that the value of said premises is impaired by any structural addition or alteration placed thereon by the said second party, the fact of such impairment and the extent thereof shall be determined by 3 arbitrators, 1 selected by each of the parties hereto and the third chosen by the 2 so selected, the decision of said arbitrators to be binding on the parties hereto. It is understood and agreed that the vault lining, vault doors and other vault equipment are the property of the second party, and may be removed by said second party at the expiration of this lease."

Under the above paragraphs of the lease, it was contemplated that possibly a new building would at some future time be erected to replace the old building. We are in accord with the view of the trial court that plaintiffs should receive rent on the basis of their proportionate interest in the new building.

The next question is to determine the amount of rent that defendant should pay for the use and occupancy of that part of the building owned by plaintiff. The trial court determined that a fair rental for the period from April 1, 1947, to April 1, 1957, would be the sum of $1,250 per month. We note that the lease does not mention the factors to be taken

into consideration in determining the monthly or yearly rental.

Both parties appeal from the decree of the trial court. Plaintiffs urge that the court was in error in determining that a yield of 5% upon the value of the property is a fair rate of return and that rent should be determined as of a date not later than April 1, 1947. Plaintiffs urge that earnings, volume of business, and comparative rentals with other buildings should be considered. We are of the opinion that these facts could be considered in arriving at a fair rental of the premises. See *Graseck* v. *Bankers Trust Company*, 315 Mich 650. It is apparent that the trial court gave primary consideration to plaintiffs' investment, and considering that plaintiffs' investment was enhanced in value by the general prosperous conditions, and not through any special efforts on the part of plaintiffs, we conclude that the rental arrived at by the trial court is fair to both parties.

It is also urged by plaintiffs that events occurring since April 1, 1947, should be considered in determining a fair rent. We are not in accord with this view. The lease provides that rental is to become effective April 1, 1947. Evidence pertaining to rental beyond that date should not be considered. In our opinion the trial court was not in error in limiting evidence of the rental to April 1, 1947. The decree is affirmed, without costs to plaintiffs or defendants.

DETHMERS, C. J., and ADAMS, BUTZEL, CARR, BUSHNELL, BOYLES, and REID, JJ., concurred.